IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GNANA M. CHINNIAH, <u>et</u> <u>al.</u>, : | |
|     Plaintiffs : | |
| : | No. 1:08-cv-01330 |
| v. : | |
| : | (Judge Kane) |
| EAST PENNSBORO TOWNSHIP, <u>et</u> <u>al.</u>, : | |
|     Defendants : | |

<u>MEMORANDUM</u>

Plaintiffs Gnana and Suganthini Chinniah, proceeding <u>pro se</u>, move the Court to enter judgment as a matter of law in their favor, or, in the alternative, move the Court to order a new trial on Plaintiffs' equal protection and substantive due process claims. (Doc. No. 267.) The motion is fully briefed and ripe for disposition. For the reasons that follow, the Court will deny Plaintiffs' motion.

I.   BACKGROUND

Plaintiffs Gnana and Suganthini Chinniah, who are of Indian descent and who are adherents of Hinduism, purchased property in East Pennsboro Township in September 2007. (Doc. No. 196 ¶ 3.) At the time of purchase, two partially-completed townhouses were situated on the property, and Plaintiffs promptly began work on securing the necessary building permits and arranging construction to make the buildings habitable. On November 2, 2007, Defendant Jeffrey S. Schultz attempted to conduct a framing inspection, during which he determined that Plaintiffs needed to remove the drywall and insulation they had installed in order for him to complete the inspection. (Doc. No. 104-2, Ex. 4.) Plaintiffs objected, arguing that the framing inspection had been completed before they purchased the property. Defendant Schultz then issued a stop work order pending completion of the framing inspection, which Plaintiffs

successfully challenged in the Court of Common Pleas of Cumberland County, Pennsylvania. (Doc. No. 104-2, Ex. 8, 9.)  Plaintiffs did not resume work on the property, but filed complaints with Defendant East Pennsboro Township over the next several months concerning alleged municipal code violations at a neighboring property operated by Mr. Tex Roadcap, a Caucasian male.  (Doc. No. 104-2, Ex. 11, 12.)  On July 14, 2008, Plaintiffs filed a civil rights complaint against Defendants East Pennsboro Township and Jeffrey S. Shultz, alleging that the above-described course of conduct constituted discrimination on the basis of their race and religion. (Doc. Nos. 1, 14.)  On June 5, 2012, the Court granted in part and denied in part Defendants' motion for summary judgment, and set the case for trial.  (Doc. No. 161.)  On November 25, 2013, following a four-day jury trial, the jury delivered a verdict in favor of Defendants, and against Plaintiffs on all claims.  (Doc. No. 264.)  On December 20, 2013, Plaintiffs moved the Court to enter judgment in their favor as a matter of law, or alternatively, to order a new trial. (Doc. No. 267.)

## II.     STANDARD OF REVIEW

### A.     Post-trial motion for judgment as a matter of law

Federal Rule of Civil Procedure 50(a) provides that if a party has been fully heard on an issue during a jury trial, and a court finds that a reasonable jury would not have a "legally sufficient evidentiary basis" to find for the party on that issue, the court may grant a motion for judgment as a matter of law against that party on a claim or defense.  Fed. R. Civ. P. 50(a).  A motion for judgment as a matter of law "must specify the judgment sought and the law and facts that entitled the movant to judgment."  Fed. R. Civ. P. 50(a)(2).  A party's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the opposing party on notice

waives his right to raise the issue post-trial. Williams v. Runyon, 130 F.3d 568, 571-72 (3d Cir. 1997). Moreover, if "a party fails to move for judgment as a matter of law at the close of all the evidence, the party wholly waives the right to mount any post-trial attack on the sufficiency of the evidence." Yohannon v. Kenne Corp., 924 F.2d 1255, 1261 (3d Cir. 1991); see Follette v. Nat. Tea. Co., 460 F.2d 254, 254 (3d Cir. 1972).

### B.     Motion for a new trial

When a party combines its motions for a new trial under Federal Rule of Civil Procedure 59(a) with a motion for judgment as a matter of law under Rule 50, a court must review the motion for a new trial under the same standards that would apply if the motion were independently asserted. Rule 59(a) provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury." The decision to grant a party's motion for a new trial is "confided almost entirely" to the discretion of the court. Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980). A court may not grant a new trial solely on the grounds that it would have reached a different conclusion than the jury. Olefins Trading, Inc. v. Han Yang Chem. Corp., 9 F.3d 282, 290 (3d Cir. 1993).

A motion for a new trial is properly granted when: (1) there is a significant error of law, to the prejudice of the moving party; (2) the verdict is against the weight of the evidence; (3) the size of the verdict is against the weight of the evidence; or (4) counsel engaged in improper conduct that had a prejudicial effect on the jury. Maylie v. Nat'l R.R. Passenger Corp., 791 F. Supp. 477, 480 (E.D. Pa. 1992). When a court is faced with conflicting evidence that is subject to two interpretations, a trial court should generally decline to order a new trial. Klein v. Hollings, 992 F.2d 1285, 1295 (3d Cir. 1993). Generally, granting a motion for a new trial is

proper only "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consol. R.R. Corp., 926 F.2d 1344, 1353 (3d Cir. 1991). A verdict must be upheld so long as it is supported by a "minimum quantity of evidence from which a jury might reasonably [decline to] afford relief." Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 290 (3d Cir. 1991).

### C. Fourteenth Amendment: Equal Protection Clause

Plaintiffs' complaint alleged that Defendants violated the Equal Protection Clause by treating them differently on account of their race and religion. The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 2. "The central purpose of the Clause is to prevent the States from purposely discriminating between individuals on the basis of race." Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 543 (3d Cir. 2011) (citation and quotation marks omitted). "Selective discriminatory enforcement of a facially valid law is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment." Jewish Home of E. Pa. v. Ctrs. for Medicare and Medicaid Servs., 693 F.3d 359, 363 (3d Cir. 2012) (citation omitted). To establish a selective enforcement claim, a plaintiff must demonstrate that he or she was (1) treated differently from another, similarly-situated individual, and (2) the selective treatment was based on an unjustifiable standard, such as "race, or religion." Id. A plaintiff must "provide evidence of discriminatory purpose, not mere unequal treatment or adverse effect." Id. (citation omitted).

### III. DISCUSSION

### A.     Motion for judgment as a matter of law

Plaintiffs move the Court to enter judgment as a matter of law in their favor on their equal protection claims.  (Doc. No. 267, Doc. No. 268 at 2.)  Defendants urge the Court to deny Plaintiffs' post-trial motion for judgment as a matter of law because Plaintiffs failed to move for judgment as a matter of law at any time during the trial.  (Doc. No. 270 at 6.)  The Court agrees.  Although Defendants moved for judgment as a matter of law on the third day of the trial (Transcript Day 3-114:13-14), Plaintiffs did not move for judgment as a matter of law at any point.  (See Doc. No. 268 at 2.)  Accordingly, Plaintiffs are now foreclosed from doing so, and the Court will deny Plaintiffs' motion for judgment as a matter of law.  See Yohannon, 924 F.2d at 1261 ("[T]he failure to move for a directed verdict at the close of all evidence does more than limit an aggrieved party's remedy to a new trial.  In this Circuit, it wholly waives the right to mount any post-trial attack on the sufficiency of the evidence.") (citations omitted).

### B.     Motion for a new trial

Plaintiffs argue that the evidence at trial "clearly showed" that Defendants East Pennsboro Township and Jeffrey Shultz violated their right to equal protection, and thus Plaintiffs are entitled to a new trial.  In support, Plaintiffs cite several categories of evidence presented at trial relating to Plaintiffs' equal protection claim.

#### 1.     PA UCC 2004 and International Residential Code of 1995

Plaintiffs' first point of contention is that they were required to comply with the Pennsylvania Uniform Construction Code of 2004 (PA UCC 2004), while the former non-Indian owner of the property, Mr. Mowery, was only made to comply with the International Residential Code of 1995 (IRC 1995).  The Court rejects Plaintiffs' argument.  The jury heard evidence

5

suggesting that the IRC 1995 was subsequently incorporated into the PA UCC 2004, meaning that a jury could reasonably find that Plaintiffs and Mr. Mowery were held to the same standard. (Transcript Day 2-47:5-11, 47:24-25, 48:1-7; Transcript Day 4-25:11-14, 28:5-7, 33:3-9, 33:14-21, 36:9-13.)

### 2.     Stop work orders and building permits

Plaintiffs submit they were required to obtain two building permits whereas Mr. Mowery, the former non-Indian owner of the property was only required to obtain one building permit. Plaintiffs further assert that Defendant Shultz did not issue a stop work order to Mr. Mowery when his building permit expired, but issued multiple stop work orders to Plaintiffs after they failed the framing inspection. (Doc. No. 268 at 11.) The Court finds that Plaintiffs' argument is without merit. First, the jury heard evidence that Mr. Mowery was only required to obtain a single permit because his "initial permit was for a single-family, one house," whereas Plaintiff Gnana Chinniah had "two divisions, A and B, and a potential C," and thus required two permits. (Transcript Day 4-38:18-25, 39:1-5.) Concerning Plaintiffs' assertion that Defendant Shultz issued stop work orders to Plaintiffs against all lots because "the construction was progressing too rapidly," and this fact constitutes "proof of more favorable treatment to similarly situated non-Indian owner," (Doc. No. 268 at 11), the jury also heard Defendant Shultz testify that he issued a stop work order on all units "[b]ecause of the errors" he found in Unit A that involved "fire stopping . . . and the inability to see the insulation installation" (Transcript Day 3-12:1-8). Accordingly, the Court finds that a reasonable jury could conclude that this evidence did not mandate finding Defendant Shultz violated the Equal Protection Clause.

### 3.     Parking spaces per unit

Plaintiffs submit that they were made to provide three parking spaces per unit, yet Defendant Shultz did not require Mr. Mowery to meet the same 2007 parking ordinance requirement. (Doc. No. 268 at 12.) Plaintiffs also argue that Defendants "reversed this Ordinance in 2010" to allow a non-Indian developer to provide only two parking spaces per unit for his proposed 336-unit apartment building. (Doc. No. 268 at 12 (citing "public record/fact in a Patriot News article").) The Court rejects this argument. First, the jury heard Mr. Robert Owen testify during the trial that "at some point during the time Mr. Mowery had it and the time Mr. Chinniah acquired it, the township commissioners had changed the zoning ordinance as far as two units per – two parking spaces per unit, which was the ordinance requirement, and then required three for the townhouses." (Transcript Day 3-51:12-17.) Accordingly, a reasonable jury could conclude that requiring Plaintiffs to comply with the new parking ordinance did not demand a finding of differential treatment. Moreover, as Plaintiffs do not provide any support or record evidence for their argument concerning the parking space waiver for the 336-unit apartment building other than citing an unspecified Patriot News article, the Court is not obliged to consider it.

### 4. Window egress requirements and Mr. Gould

Fourth, Plaintiffs contend that Defendant Shultz measured their windows for egress compliance with the 2004 PA UCC, but Defendants "never raised these issues with Mr. Mowery who had installed them and they never required him to comply with PA UCC." (Doc. No. 268 at 12.) Plaintiffs also assert that the fact Mr. Gould accompanied Defendant Shultz when conducting the window egress inspection also indicates that Defendant Shultz was treating them differently, because Mr. Gould very rarely accompanied Defendant Shultz on home inspections.

(Id. at 13.)  The Court rejects both points.  With respect to the window egress requirements, Defendant Shultz testified that "[t]he egress requirements did not change from 1995 to 2006, but I never did an inspection, nor did Mr. Pietraopaoli," meaning that an inspection was necessary to verify that "people can get out of the bedroom windows."  (Transcript Day 4-37:16-20.)  Although Plaintiffs argue that the windows had already been approved (Doc. No. 268 at 13), a jury could conclude from Defendant Shultz's testimony that no inspection had taken place as of the time that Plaintiffs purchased the property, and therefore requiring Plaintiffs to comply with the egress requirements for the windows did not mandate a finding of differential treatment.

Concerning Plaintiffs' assertion that Mr. Gould accompanied Defendant Shultz on his inspections only "1%" of the time, and this constitutes evidence of differential treatment, the jury heard testimony from Defendant Shultz that his previous encounter with Plaintiff Gnana Chinniah on an unrelated property did not go well, and thus Defendant Shultz decided to bring Mr. Gould along "to assure my actions and to record that."  (Transcript Day 4-44:8-16.)  Mr. Gould also took photographs during the property inspection.  (Transcript Day 4-107:8-9.)  The Court agrees that Mr. Gould accompanying Defendant Shultz on Plaintiff Gnana Chinniah's inspection, as well as Mr. Modi's inspections (Transcript Day 4-116:1-6) could constitute evidence of differential treatment.  However, because evidence in the record existed that Defendant Shultz was bringing Mr. Gould along to "assure my actions," a jury could also find that the fact Defendant Shultz brought along a witness cuts against a finding of differential treatment, and the Court is obliged to respect that finding.

### 5. Defendant Shultz's inconsistent testimony

Plaintiffs point to inconsistencies in Defendant Shultz's trial testimony and depositions,

and argue that these discrepancies mandate finding Plaintiffs were subject to discrimination. (Doc. No. 268 at 14.)  Plaintiffs also point the Court to the fact that Defendant Shultz started his inspection at 12:30 pm, rather than the scheduled appointment of 1:00 p.m.  (Id.)  Finally, Plaintiffs cite Defendant Shultz's testimony, contending that he testified he "issued the Stop Work orders against Lot 3B and Lot 3C although he never inspected them or found any violation in them because of his 'non-amicable relationship'/personal animus with the Plaintiffs, but NOT on any rational basis."  (Id.)  With respect to the alleged appointment discrepancy, the Court finds that a jury was entitled to reject this discrepancy as evidence of differential treatment.

      Concerning Plaintiffs' argument that Defendant Shultz testified that he issued a stop-work order because of his "non-amicable relationship" with Plaintiff Gnana Chinniah, the Court observes that the jury heard varied testimony from Defendant Shultz as to why he issued the stop work order.  First, as explained previously, the jury heard Defendant Shultz testify that he issued a stop work order on all units because the issue concerned "firewall assembly," and thus a stop work order was also necessary "to protect Unit B from Unit A and, again, vice versa." (Transcript Day 4-50:4-8, 78:10-13, 79:5-6.)  Defendant Shultz acknowledged that issuing a stop work order on Unit C was a mistake.  (Transcript Day 4-50:9-10.)  Second, although Plaintiffs are correct that Defendant Shultz also testified that "[p]revious dealings with Mr. Chinniah were not always amicable," and that "[b]ecause of [his] non-amicable dealings with Mr. Chinniah, [Defendant Shultz] wanted to stop his construction of other properties," (Transcript Day 3-12:16-21, 13:4-7), Defendant Shultz recanted this testimony the next day, claiming that although "[t]hat's what I said, [] that's not what was meant," and "[i]f that's the way it was interpreted, that's not the way it was meant" (Transcript Day 4-82:5-6, 82:17).  The jury was entitled to draw

their own conclusions with respect to the weight of this conflicting testimony.  See Kerry Coal Co. v. United Mine Workers of Am., 488 F. Supp. 1080, 1095 (W.D. Pa. 1980) ("The credibility of witnesses is a matter for the jury, and a new trial may not be granted merely because the evidence is sharply in conflict, or because the jury could have drawn different inferences or conclusions.") (citation omitted).  Accordingly, the Court will not order a new trial on this basis.

### 6. Defendant East Pennsboro Township's deliberate indifference

Plaintiffs assert they presented evidence showing that Defendant East Pennsboro Township's Manager Stephen Gill and the Director of Housing and Community Development John Owen "were made aware about the burdensome code enforcement measures and discriminatory treatment of the Building Inspector Mr. Shultz," and were "deliberately indifferent to Plaintiffs' complaints, and refused to allow the Plaintiffs to use any third-party Inspections to avoid the continuing conflicts."  (Doc. No. 268 at 17.)  In support of this argument, Plaintiffs cite an email in which their former counsel wrote: "I spoke with Robert Gill for about 10 minutes this morning . . . . [h]e seemed genuinely unfamiliar with the most recent dealings . . . . We also spoke about what I see as an overly protective inspector who seems to not accept third-party inspection; I suggested that this is wrong, and would he look into it.  He agreed to check things out and get back to me."  (Doc. No. 268 at 16 (citing "Plaintiffs' Trial Exhibit, Page 4, Mr. Solomon Email April 22, 2008).)  Because Plaintiffs cite only two emails their counsel wrote to Mr. Gill in support of their argument that Defendant East Pennsboro Township was deliberately indifferent to their complaints, the Court finds that the jury was entitled to reject this evidence.  Moreover, because the jury would need to first find that Defendant Shultz discriminated against Plaintiffs before proceeding to determine Defendant East

Pennsboro Township's liability, see Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004) (requiring "a pattern of underlying constitutional violations" for municipal liability to attach), the Court finds Plaintiffs' arguments concerning Defendant East Pennsboro Township's deliberate indifference are moot because evidence in the record supports the jury's finding that Defendant Shultz did not discriminate against Plaintiffs.

### 7. Enforcement actions at neighboring properties

Plaintiffs submit they presented "ample evidence" to the jury concerning Defendants' "blind-eyed attitude" to property code violations at two neighboring properties owned by white individuals: 4 Cassastt Street and 4 Roosevelt Street. (Doc. No. 268 at 18.) Plaintiffs argue that several exterior violations are present at Tex Roadcap's property located at 4 Cassatt Street; namely, "accumulation of tires, waste oil barrels, wood piles/junk," and that "[a]lthough Defendants took some enforcement actions after the second complaint, the violations at these properties continue to the present date, essentially unchallenged." (Id.) The Court rejects this line of argument. Although the jury heard Plaintiffs present evidence that Defendant East Pennsboro Township ignored ongoing property violations at 4 Cassatt Street, the jury also heard Robert Owen testify that Tex Roadcap's property was subject to a non-conforming use exception, because his property existed as a garage from the 1940s or 1950s, and therefore no "actual violation" existed at the property because of the preexisting nature of his business. (Transcript Day 3-185:14-25,188:21-25, 189:1-4.) The jury was entitled to accept Mr. Owen's explanation, and decline to find that Defendant East Pennsobro Township treated Tex Roadcap differently than Plaintiffs.

### 8. Tex Roadcap's intimidating behavior toward Plaintiffs

Plaintiffs assert that Tex Roadcap "accosted, threatened and intimidated" Plaintiff Gnana Chinniah in response to Plaintiffs' complaints about the property code violations at 4 Cassat Street, and the Chief of Police failed to take Plaintiff Chinniah's complaints seriously or keep them confidential. (Doc. No. 268 at 19.) The jury heard Mr. Roadcap testify that he told Plaintiff Gnana Chinniah that "I'd appreciate if he'd mind his own business and not be siccing the township on me," and "when you're calling the township on me, you're barking up the wrong tree." (Transcript Day 4–92:20-25, 93:1-4.) Mr. Roadcap also testified that this was his only encounter with Plaintiff Gnana Chinniah. (Transcript Day 4–93:9.) Concerning Plaintiffs' complaint that the "Codes Officers breached the confidentiality about Plaintiffs' complaint and informed Tex Roadcap," the jury heard Tex Roadcap <u>deny</u> that a township official had contacted him, and he further testified that he could ascertain Mr. Chinniah had complained because "I wasn't getting any complaint, you know, from the township before, and then all of the sudden – you know, it's pretty obvious what happened." (Transcript Day 4-95:3-5.) Accordingly, the Court finds that a reasonable jury could conclude that the Codes Officers did not breach the confidentiality of Plaintiffs' complaint, and the jury was entitled to reject Plaintiffs' evidence concerning Tex Roadcap's alleged intimidation as demanding a finding of differential treatment.

### 9. Third-party inspection

Plaintiffs also assert that they presented evidence of a successful third-party inspection by Mr. Pennoni, and this constituted evidence of Defendants' selective and biased enforcement actions. (Doc. No. 268 at 21.) However, Plaintiff Gnana Chinniah expressly acknowledged during his testimony that Mr. Pennoni's report cited "possible deficiencies of the codes adopted by the Pennsylvania Uniform Construction Code." (Transcript Day 2-83:1-8.) Accordingly, the

Court concludes that a reasonable jury could find that evidence of this report does not support a finding of differential treatment, because the jury heard evidence that a third-party inspector found, like Defendant Shultz, that Plaintiff Gnana Chinniah's property did not comply with the PA UCC 2004.  (See id.)

### 10.   Mr. Girish Modi

Plaintiffs further argue that they presented evidence that Defendants Shultz and East Pennsboro Township treated Mr. Girish Modi, who is not a party to this action, differently on account of his ethnicity and this evidence supports Plaintiffs' equal protection claim.  (Doc. No. 268 at 22.)  Specifically, Plaintiffs assert that Defendant Shultz forced Mr. Modi to submit several permits for a deck that he proposed to build at his home, and that Mr. Modi perceived Defendant Shultz's behavior as "different/discriminatory given his contentions that neighboring/similarly situated non-Indian landowners who built decks in the same development (2005/2006 phase) did not have to meet [special handrail requirements]."  (Doc. No. 268 at 23.)  Defendants argue that they presented sufficient evidence at trial for a jury to conclude that Mr. Shultz's conduct toward Mr. Modi was lawful, and, furthermore, that Mr. Modi is not similarly-situated to Plaintiffs, because he attempted to secure a permit for exterior deck construction.  (Doc. No. 270 at 8.)

The Court finds evidence exists in the record from which a jury could conclude that Defendants did not discriminate against Mr. Modi.  First, with respect to Plaintiffs' assertion that Mr. Modi was required to get multiple permits for his deck, Mr. Modi testified that his first permit expired.  (Transcript Day 1-107:18-19.)  Although Mr. Modi testified that he told Defendant Shultz that he felt he was being "singled out to comply with these minor

requirements," as there "are a number of decks in our community that do not meet most of these above requirements," (Transcript Day1-114:15-20), Mr. Modi also testified that after he complained, Defendant Shultz and Mr. Gould completed a final inspection of the deck on January 27, 2010, and that "within five minutes" of arriving, they approved the deck. (Transcript Day 1-118:7-9.)  The jury also heard evidence that Mr. Modi did not know whether the owners of other decks in his neighborhood were white or non-white, or, whether the decks were built before or after April 2004, when the Pennsylvania Uniform Construction Code took effect. (Transcript Day 1-119:6-15.)  Mr. Modi also acknowledged that the items flagged during Mr. Shultz's inspections were "required" as part of the Uniform Construction Code.  (Transcript Day 1-123:5-8.)  Accordingly, a reasonable jury could conclude that Defendant Shultz did not discriminate against Mr. Modi, and, this category of evidence did not mandate finding that Defendants discriminated against <u>Plaintiffs</u>. The Court will declines Plaintiffs' request for a new trial on this basis.

> **11.** **Dr. Anita Kapoor**

Plaintiffs further argue that Defendants' treatment of Dr. Anita Kapoor, who is not a party to this action, "clearly demonstrated that Defendants adopted similar 'custom or pattern or policy' of disparate enforcement of their ordinances/codes" and that Defendants violated the Equal Protection Clause.  (Doc. No. 268 at 25.)  Plaintiffs submit that their trial evidence showed Defendants' enforcement actions against Dr. Kapoor "became very aggressive, resulting fines initially of $20,300, and eventual condemnation of their 4-Unit property for alleged structural deficiencies," (Doc. No. 268 at 25), and that Defendants admitted during trial they could not quote similar "extreme enforcement measures against a non-Indian landowner."  (Doc. No. 268

at 28.) Defendants argue that Plaintiffs' reliance on the facts of these other events is "misplaced, [as] Defendants presented considerable evidence to establish that each of these situations was handled in a lawful, non-discriminatory manner." (Doc. No. 270 at 8.)

The Court rejects Plaintiffs' argument. First, Defendants presented evidence at trial from which a reasonable jury could infer that Defendants' enforcement actions with respect to Dr. Kapoor's properties were justified. The jury heard considerable evidence about maintenance code violations at Dr. Kapoor's properties, including a letter from one of Dr. Kapoor's previous tenants, Tracey Tinkey, whom had complained about a "step broken, electrical wiring, pipes underneath the sink, pipe upstairs in the bathroom," (Transcript Day 1-69:22-25), a complaint from another tenant, Kimberly Brown[1] (Transcript Day 1-71:12-16), as well as several letters from the Township concerning property maintenance (Transcript Day 1-72:1-18, 74:10-20, 75:10-12, 77:23-25, 78:1-5.) The jury also heard evidence that Dr. Kapoor pleaded guilty to all twenty property code citations. (Transcript Day 1-82:13-15.) Accordingly, the Court finds that evidence existed in the record from which a jury could find that Defendant East Pennsboro Township's enforcement actions against Dr. Kapoor did not constitute evidence of selective enforcement supporting Plaintiffs' own lawsuit against Defendant East Pennsboro Township.

### 12. Improper juror contact and jury deliberations

Plaintiffs argue that they "noted improper contact between Juror #1 and the Defense

---

[1] The jury also heard evidence concerning a letter the Township received about property code violations at Dr. Kapoor's property, including a letter in which a tenant complaint that the apartment had been "vacant since the end of February, it was left dirty. There was food in the refrigerator, cat food on the floor, boxed food was left out, the second-floor window has been opened all this time . . . . We have seen bats fly out of there. The smell is so bad, it comes through my apartment." (Transcript Day 1-97:19-24.)

Counsels and some secret/questionable gestures of Juror #1 towards the Defendants." (Doc. No. 268 at 31.) Plaintiffs also assert that Juror #1 made predictions out loud about whether the Steelers or their opponents would win the game. (Id.) Although Plaintiffs acknowledge their counsel was "aware and concerned about the situation," they assert that their former counsel failed to notify the undersigned. Plaintiffs also cite the fact that Plaintiffs' former counsel Devon Jacob withdrew his appearance as counsel on Sunday, November 24, 2013, although his firm withdrew their appearance in February 2013, as supporting their contention of unfair play. (Id.) Taking these factors together, Plaintiffs contend that "some jury deliberations were made during the weekend," and the attorneys involved "already knew about the outcome/verdict." (Id.) Defendants urge the Court to reject Plaintiffs' arguments as "baseless speculation," and, attach an affidavit in which Defense counsel attests that no improper conduct occurred between defense counsel and jurors. (Doc. No. 270 at 12, Doc. No. 270-1.) The Court agrees with Defendants. Plaintiffs cite only their own observations regarding Juror Number One in support of their improper conduct claim. Moreover, given that Plaintiffs allegedly drew their counsel's attention to the alleged improper conduct, and he declined to raise the issue with the Court during the trial (See Doc. No. 268 at 31), the Court is confident that Plaintiffs' allegations of improper conduct are without merit. Accordingly, the Court will decline to order a new trial on this basis.

**IV.   CONCLUSION**

The Court will deny Plaintiffs' motion for judgment as a matter of law, or, in the alternative, for a new trial. An order consistent with this memorandum follows.